We have six cases on the calendar this morning from a variety of sources, one from the MSPB, one from the District Court, the Court of Veterans Appeals, PTAB, and the Claims Court. Two from the Claims Court are submitted on the briefs and will not be argued. First case is Manivannan v. Energy, 2020-18-04. Mr. Powell. Good morning, Your Honors, and may it please the Court, my name is John Powell, counsel for Petitioner Iaconi Manivannan. I'd like to reserve four minutes of my time. You don't need to, I am asking unless you wish to. Thank you, Your Honor. I'll take it off. I'm a little confused as to what relief you're asking for here. Your client voluntarily resigned from the agency and you seem to be challenging some earlier transfers that happened. What exactly are you asking us to do here at the end of the day? Your Honor, we think the right relief would be some sort of corrective action, so under the statute that could involve various possibilities. It could involve something like compensatory damages. But you're not challenging his resignation from the agency as involuntary, right? That's right, Your Honor. I think that the most likely relief here would be discipline of the parties involved would be appropriate corrective action. I mean, if the MSPB or this Court finds that whistleblower retaliation has occurred, the statute provides that some compensatory action should be taken or some corrective action should be taken. So here we think that could involve the discipline addressing this within the agency so this doesn't happen again to someone else. I mean, you're here to discipline an agency employee. Excuse me? You want us to discipline the agency employee? Well, Your Honor, we actually would just like you to find that the administrative judge here failed to properly decide this case and send it back down for him for a case with proper discovery and a better weighing and imposition of the evidentiary burdens. And then, if after that proceeding, the administrative judge finds that we have carried our burden and the agency has not, then it's really up to the administrative judge at that point to impose a corrective action that is appropriate. It's my understanding that... Do you have any authority for the proposition that a corrective action could be anything unrelated to the actual whistleblower, him or herself? No, I don't think so, Your Honor. I don't think that's what we're saying. I'm not sure I understand the question. Sorry. A corrective action is normally viewed as something that pertains to the whistleblower. In other words, the whistleblower either gets the job that they wanted, or they get their promotion, or to the extent that they claim that they were improperly discharged, they get reinstated. But I have never seen a case where the corrective action didn't relate to some employment-related benefit directly to the individual. And I'm asking if you have ever seen such a case. Your Honor, I do believe that such a case exists, but I can't name one for you right now. It's our understanding that under the statute, corrective action can involve discipline of the people who retaliated against the employee for whistleblowing. That's part of the statutory framework. I've certainly seen cases where that was part of the relief granted. I'm not sure if I've seen a case that that was the sole relief granted, but I don't know a reason that it couldn't be. I would say, though, I don't want to waive any potential other relief, compensatory relief to Dr. Manny Bannon. There are allegations in his OSC complaint that were advanced below that he suffered medical damages as a result of... Well, can the board award that kind of relief? I believe they can, Your Honor. I believe they can award compensatory relief for direct damages caused by whistleblower retaliation, things that satisfy the statute. So, damages flowing from the fact that he was stressed as a result of the discipline? Yes, Your Honor. At one point during this long saga, Dr. Manny Bannon was confronted with an internal investigation on very short notice and fainted in the office. I didn't read your brief as suggesting that you were challenging the investigation as being the product of a protected disclosure. Well, Your Honor, we do allege that the initiation of the management-directed inquiry was an adverse action that these prior disclosures contributed to, but I agree with you that that's the focus of our appeal. We think the main errors below in the decision currently before the court have to do really with the first and second disclosures and the transfers and hostile work environment that flowed from those disclosures. So, just to be clear, the protected disclosures that you're challenging on this appeal are the disclosure with respect to the funding issue? It's actually two. And the second one is the disclosure about the authorship issue? Yes, Your Honor, that's correct. Those are the only two, right? Those are the only two disclosures. How could a belief be reasonable that not being included as an author is an instance of gross mismanagement or a violation of law? Even if he genuinely was a co-author? Thank you, Judge Lurie. I can explain that. So, it can be. So, here, with respect to the authorship disclosure, Dr. Manny Van was alleging that he was improperly removed as an author of a paper of a scientific publication, which he co-authored with other scientists, including a scientist named Dr. Wu at the University of West Virginia, who he had been working with for many years. The reason that that is significant in this context is that the laboratory here, the National Energy Technology Laboratory, which I'll refer to as NETL, it has a policy about authorship. And in Dr. Manny Van's profession, the authorship of the paper is actually very significant, and the policy is very significant. And there's testimony, uncontroverted testimony, by the agency witnesses in this case, that they take that policy seriously. I would point to Dr. Gerdes' testimony that's cited in our brief. The reason it's so important is both because correct citation of authors and attribution of authors on scientific papers is both important for science to avoid things like gift authorship, but it's also important for... That's a judgment among scientists as to who contributed in a scientific sense. That's right, Your Honor. But that's not gross mismanagement. No, Your Honor. This would be a violation of a policy. So under the laws, we understand it, and there are cases that we can point you to. One of them is El-Kassir, and one of them is Drake. Those are two cases in which someone was alleging a violation of an internal agency policy. What's the policy that determines who should be an author on a scientific paper? Isn't that a scientific judgment? Well, yes, Your Honor. I think to some degree it is a scientific judgment, but what NEDL does is science. The main thing that employees at NEDL, like Dr. Manny Van, are promoted or not promoted based on is the number of scientific publications they have published. Don't you have a problem, though, that Dr. Wu said that he wasn't entitled to authorship, and there's also a policy against gift authorship? Thank you, Judge O'Malley. We don't see that as a problem for us for at least two reasons. So the first reason is the question here is whether or not Dr. Manny Van had a belief or could have had a reasonable belief, whether someone in Dr. Manny Van's position could have had a reasonable belief that the authorship policy was violated. We have testimony that says the violation of the authorship policy is a very serious matter. We don't have the authorship policy itself because the agency did not produce it. They produced emails that attached it, but they didn't produce the policy itself. What's the retaliatory action that was taken against him based on that disclosure? Thank you. The first retaliatory action, it was late 2010 or mid-2010 to early 2011 disclosure, and I can walk through how that process went, but it resulted in a meeting on March 8, 2011, in which Dr. Manny Van and his supervisor sort of exploded. You can look to Dr. Tucker's testimony in the record. He became extremely angry at Dr. Manny Van. He was screaming at him. There's a declaration in the record of another scientist. That's a harassment? But no. Weeks after that, they caused him to be transferred to a different division within NETL. He was then placed under the supervision of Dr. David Allman, who is based in Oregon. So they transferred him to a different division, and that is- But the administrative judge found that your client requested the transfer. That's right, Your Honor. And frankly, we're challenging that finding because there is no evidence in the record to suggest that Dr. Manny Van requested that transfer, and on the contrary, there's a great deal of evidence in the record that Dr. Manny Van did not request that transfer. Okay, but first, let's go back to what you were talking about before about why this is a protected disclosure. The administrative judge disbelieved your client when he said the authorship was improperly denied to me and that I was taken off the paper. What evidence do we have that would support a reasonable belief on your client's part that he had been improperly deprived of authorship, other than his own testimony? Thank you, Your Honor. I would point you to the, for example, an email from Kirk Gerdes to Dr. Wu talking about how Dr. Wu and Manny Van had been working together for a long time on projects for the fuel cell team, which was the work that this paper came out of, and there's also- Co-authored papers on that subject and was given authorship credit. So, the question is, what's the evidence with respect to this particular paper that would suggest that he had a reasonable belief that he was improperly being denied authorship? Yes, Your Honor. So, there's also testimony in the record from agency witnesses, both Dr. Gerdes and Dr. Gremmin, saying that they were aware that Dr. Manny Van had been working closely with Dr. Wu and his student who was primarily working on the paper in connection with this very same research. And I would also point out, Your Honor, that although I'm sensitive to the fact that the administrative judge made a credibility determination against my client, this court has also ruled many times that a credibility determination can't be used to ignore or disregard uncontroverted testimony. So, when Dr. Manny Van- What's the uncontroverted testimony that he worked on this paper? Yes. As opposed to this area, which led to multiple papers. Dr. Manny Van has uncontroverted testimony that he, and I'll explain why it's uncontroverted in one moment, but that he was working with Dr. Wu on this paper. There's all kinds of other evidence that he was working with Dr. Wu at this time. And when we asked the agency witnesses, well, how did you know that Dr. Manny Van wasn't working with Dr. Wu at this time? They all said, well, we don't know. We don't know what he was doing. There's no basis. The only thing that they point to is the Dr. Wu email. But there's two reasons that this court should not consider that email. The first is that the test here is, could Dr. Manny Van reasonably have believed that he should have been on this paper? And we're saying he's been working with Dr. Wu closely on this research. He says it's not controverted. And the Dr. Wu email comes after the disclosure. So, there's no way that Dr. Manny Van could have known about the- Probably wanted to save some rebuttal time. It's almost finished. Would you like to save it? I would, yes. Thank you very much. I appreciate it. Mr. Kifora. Good morning, your honors. And may it please the court. The key finding in this case is that the MSPB found that Dr. Manny Van was not a whistleblower. The two alleged protected disclosures that have been already discussed this morning, the board found were not protected disclosures. And therefore, he did not meet his burden to prove by a preponderance of the evidence that he had made such disclosures. One of my concerns is with the way the board phrased things and the way the LJ phrased things. And that is that he didn't have to be right that he was entitled to be an author, right? Yes, that's correct, your honor. He just had to have a reasonable belief that he was. And that therefore, when his managers told Dr. Wu not to list him as an author, I know there's a debate over what Wu wanted. But when they were involved in that decision making, that he then could have had a reasonable belief that that was an abuse of their authority. Well, with respect, your honor, Dr. Wu was the deciding authority as to who was entitled to authorship credit. And the board made two findings or addressed two issues with regard to the allegation from Dr. Manvan. One, whether or not he was entitled to credit. And two, and this is really the key one, is that whether or not Dr. Gemmon and Dr. Gerdes abused their authority by attempting to have him removed from the paper. The board found that there was substantial evidence in the record that they did not take that action. The emails that were previously discussed arose after there was a dispute over the authorship credit. And Dr. Gerdes and Dr. Gemmon inquired of Dr. Wu. Right, but those emails came after the disclosure, right? How is it relevant if they're after the disclosure, as to his reasonable belief at the time of the disclosure? Yes, your honor, but there's no evidence in the record to support the contention that they took some action prior to the disclosure to have him removed from the paper. Well, other than his own testimony. That's correct, your honor. Other than his own testimony, which the administrative judge considered and made a credibility determination in light of the evidence in the record was not credible. What about the policy regarding authorship that was allegedly violated? Yes, your honor. So there is testimony in the record that the scientists at Nettle followed certain guidelines concerning authorship credit. But Dr. Manavanan has never established that there was an agency policy that carried the force of law. Concerning those guidelines. I thought other witnesses testified that there was such a policy. They testified, your honor, that there were guidelines, academic guidelines that they followed. But in this case, the deciding individual as to whether or not Dr. Manavanan was entitled to authorship credit was Dr. Wu. Different question. That's a question of whether he was entitled to authorship. The question that Judge Lurie was asking, and it seems to me to be pertinent, is whether a violation of the authorship guidelines could be a protective disclosure under the Disability Protection Act, if you had a reasonable basis for believing that you were improperly denied authorship credit. Do you agree that a violation of agency guidelines in that area could be a protective disclosure? I would agree that the agency witnesses testified that, yes, they do follow those guidelines. I'm going to answer my question. Do you agree that a violation of those guidelines could be protected whistleblowing, that a disclosure or violation of the guidelines could be protected whistleblowing? Yes, if the agency took that action, yes. Okay. And yes, to answer the court's question, yes, I would agree with that. However, the issue in this case, well, there's a couple issues with it. First of all, the question of whether or not Dr. Manavanan was entitled to authorship credit was a question for Dr. Wu, who is not an agency employee. The other allegation that he has brought forward was that Dr. Gemin and Dr. Gerd somehow abused their authority as agency employees to attempt to influence Dr. Wu to take his name off the paper, and there's no evidence in the record to support that. When I asked a friend on the other side what the personnel action was that he says flowed from that authorship dispute, he mentioned the two transfers, which there are separate issues I know that you would discuss with respect to those, but he also mentioned the March 11th heated conversation. Did you understand him to have actually alleged that that was a personnel action? No, Your Honor, we did not. There was an allegation, which I believe Dr. Manavanan alleged that that conversation may have contributed to a hostile work environment, but the administrative judge addressed those allegations and found that while there was not a dispute, that there was a heated conversation, that that conversation did not contribute to a hostile work environment. In other words, the administrative judge found, based on the evidence, that there was no hostile work environment. Obviously, you need to stick to the record, but it seems a little odd that all of a sudden we go from someone who is very well-respected and receiving not just good reviews but awards to all of a sudden they're in this kind of debate. Is there something else that I'm missing here or something in the record that I might have not scoured properly? Just to be clear, you're asking about the debate about the authorship of the papers? It seemed to be some kind of a turning point, and I guess I'm trying to figure out why. I mean, I can't speculate as to what the state of mind as to the various people involved is, but what the board found was that the one adverse action that took place in this case was the proposed removal, which was then followed by the voluntary resignation. So it appears that the turning point would have been the initiation of the investigation and the proposed removal. It happened a couple of years later, didn't it? It did, Your Honor. But I mean, I think Judge O'Malley's question is directed to why do we have this dispute about this authorship issue? O'Malley has 400 papers. He's an expected author right now. It just seems odd. I don't disagree, Your Honor. As was being discussed earlier, with regard to the authorship dispute, it's not in dispute that Dr. Manavan and Dr. Wu were working together at this time, but the allegation is that for some reason, which is not in the record, that Dr. Gemin and Dr. Gerdes took some action to have him removed from this particular paper. And the board judge found that there wasn't any evidence to support that. So as to the genesis of that, I'm unaware. In other words, it's not disputed that he worked on the subject matter of the paper? As to the, I don't know, the subject matter of the paper, it's not disputed that he was working with Dr. Wu in this general area. And there's even evidence in the record that at the time, there was a second paper that I believe was published contemporaneously, if not simultaneously, with Dr. Wu that Dr. Manavan was a co-author on. In fact, the board judge made a reference to that it was possible that Dr. Manavan may have been mistaken as to which paper was at issue. But again, at the time, the issue came up and Dr. Gerdes and Dr. Gemin inquired of Dr. Wu as to whether or not Dr. Manavan should be on the paper. And Dr. Wu said that the authorship of the paper was correct, indicating that Dr. Manavan should not be on the paper. Now, turning to the other alleged protected disclosure, this with regard to the funding for the battery project. The board concluded that Dr. Manavan's complaints about the unspent funds were broad policy disputes and not protected disclosures. Specifically, the board found that there was substantial evidence in the record to support this finding, that it was not gross waste or mismanagement. First and foremost, the funds at issue were returned to the agency. They were not lost. There was a decision, the testimony in the record and the other record evidence establishes that the project in question was a three-year research project that was originally scheduled to terminate at the end of fiscal year 14. Is it argued that the cancellation of the project meant that the money previously spent was wasted? Dr. Manavan appears to advance that argument, Your Honor. However, the board judge found there was substantial evidence in the record indicating that the money was not wasted. One of the other scientists involved with the project testified that all of the major experiments involved with the project had already been completed by the time it finished in 2014, so the evidence and data from those experiments was already included. There was also discussion with regard to the equipment that had been purchased for the project, and there was testimony from the other scientists that that equipment could also be repurposed so that there was no loss of equipment. What the board found was that there was no evidence in the record to support this concept that the failure to spend, or I should say the reprogramming of the money at the end of the project had any impact on the project up to that point. Does that, is it pertinent that his supervisor at that time was not a scientist, though, in making that assessment? I don't believe it does, I don't believe it is, Your Honor, because there, again, with the agency determination to reprogram the money addresses the question of loss. As to its relationship to the previously spent funds, Dr. Manavanan has not cogently explained why not spending the rest of that money would have had an impact on the earlier part of the project. Essentially, it's a bald allegation with no support, whereas the board found that there to support that the money was not wasted, rather it was a policy determination by the agency to reprogram it to other uses. I just briefly would like to reiterate the point that, again, the board made the determination that because substantial evidence supported that neither of these two alleged disclosures were protected disclosures, that Dr. Manavanan had not carried his burden to establish that he had made the required disclosures under the WPA. For that reason, as well as the other reasons articulated in our brief, we ask that this be the final signing of the MSPB. Thank you very much. Thank you, counsel. Mr. Powell, we'll give you two minutes for a vote. Your Honor, a few things, but just on the authorship dispute that I think may be helpful. Another piece of evidence for why Dr. Manavanan was reasonable or could have been reasonable in concluding that his name was taken off the paper is because, as the testimony from the agency witnesses on the record shows, there had become a dispute between Dr. Manavanan and Dr. Gerdes, who was leading the fuel cell team in 2010, before this disclosure began. Dr. Gerdes testified that...and Dr. German testified that Gerdes was frustrated because Manavanan would work on more fuel cell research than Dr. Gerdes had testified. There's also testimony in the record that Dr. Gerdes led the fuel cell team. The fuel cell team was funding Wu's research, and therefore, Dr. Gerdes had management control, some degree of management control, over Wu's funding. That's just another piece of the background of why we think this is... for reasonableness there. The other thing I'd just like to emphasize... I have two quick questions. The first protected disclosure, are you saying that the very first conversation that Dr. Manavanan had with German was a protected disclosure, or is it a later one after German supposedly took no action? Your Honor, I think that, looking at it under the law, I think that it was a protected disclosure, the first one, and then it clearly continued to be protected disclosures. He essentially talked to him in 2010, raised this issue, this angered Dr. Gerdes, and then he continued raising it with him and got the union involved, leading up to a meeting with the union on March 7th, 2011, and then a meeting with Dr. Manavanan and Dr. Tucker the next day on March 8th, 2011, and that's when there was the explosion of anger. Shortly thereafter, Dr. Gemmon spoke with Dr. Allman in Oregon and caused Dr. Allman to request the transfer, and you can see that on the SF-50 form, which, by the way, was not produced to us. It is clearly part of the record that should have been produced as part of the agency file. The only reason we have that document that shows who requested the transfer is because Dr. Manavanan, who was pro se for everything until right before the hearing in this case, he had to pursue FOIA requests and eventually got the SF-50 form, which should have been included in the agency file. Are you disputing that Dr. Manavanan wanted the transfers? Yes, I think we do dispute that. He did not want the transfers. He was happier under Dr. Allman, frankly, because our brief kind of explains that he did very well with Dr. Allman. Dr. Allman wrote these wonderful things about the EERE program in Dr. Manavanan's review, explaining how the EERE program showed amazing promise to have a potential breakthrough. This is in the agency files, which, again, this is something we did not get from the agency. We had to get from FOIA. Thank you, counsel. Did you have another question? No, sorry. Thank you, counsel. Thank you very much. Both of you, the case is submitted.